14 MAG 0286     **ORIGINAL**

Approved: _____
EUN YOUNG CHOI
Assistant United States Attorney

Before:    THE HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                :
UNITED STATES OF AMERICA                        :   SEALED COMPLAINT
                                                :
               -v-                              :   Violations of 18 U.S.C.
                                                :   §§ 1349 and 1343
                                                :
DWAYNE CAMPBELL,                                :
    a/k/a "Dwayne Emmanuel Campbell,"           :   COUNTIES OF OFFENSE:
                                                :   BRONX, MANHATTAN,
               Defendant.                       :   WESTCHESTER
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        KRYSTOFOR PROEV, being duly sworn, deposes and says
that he is a Special Agent with the United States Department of
Treasury Inspector General for Tax Administration ("TIGTA"), and
charges as follows:

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about May 2009 up to and including
at least May 2013, in the Southern District of New York and
elsewhere, DWAYNE CAMPBELL, a/k/a "Dwayne Emmanuel Campbell,"
the defendant, and others known and unknown, did combine,
conspire, confederate and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

        2.    It was a part and an object of the conspiracy that
DWAYNE CAMPBELL, a/k/a "Dwayne Emmanuel Campbell," the
defendant, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by
means of wire and radio communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the

purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

OVERT ACTS

3.    In furtherance of the conspiracy and to effect the
illegal object thereof, DWAYNE CAMPBELL, a/k/a "Dwayne Emmanuel
Campbell," the defendant, committed the following overt act,
among others, in the Southern District of New York:

a.    On or about June 13, 2009, CAMPBELL used a debit
card in Yonkers, New York.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**
(Wire Fraud)

4.    From at least in or about May 2009 up to and including
at least May 2013, in the Southern District of New York and
elsewhere, DWAYNE CAMPBELL, a/k/a "Dwayne Emmanuel Campbell,"
the defendant, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, did transmit and cause
to be transmitted by means of wire communication in interstate
and foreign commerce, writings, signs, signals, and sounds for
the purpose of executing such scheme and artifice to defraud, to
wit, CAMPBELL falsely represented to individuals, via interstate
and foreign telephone calls and emails, that these individuals
had won a lottery, which caused those victims to send payments
for purported taxes on lottery winnings to CAMPBELL.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charge
are, in part, as follows:

5.    I am a Special Agent with TIGTA and I have been
personally involved in the investigation of this matter.  My
duties and responsibilities include the investigation of
fraudulent activities and crimes that affect tax administration,
such as bribery of public officials and impersonation of
Internal Revenue Service employees.  I base this affidavit on
that personal experience, as well as on my conversations with
other law enforcement agents and my examination of various
reports and records.  Because this affidavit is being submitted
for the limited purpose of establishing probable cause for the

offense cited above, it does not include all the facts that I have learned during the course of the investigation. Where the contents of conversations of others are reported herein, they are reported in substance and in part.

### Victim-1

6.    I have spoken with an individual ("Victim-1"), and have reviewed documents provided by Victim-1. From Victim-1, I have learned the following, among other things:

a.    Victim-1 resides in Arizona.

b.    In or about March 2011, an individual identifying himself as "Mr. Gonzalez" contacted Victim-1 on Victim-1's telephone number, and stated, in substance and in part, that Victim-1 had won $750,000 in a lottery.

c.    From that point forward, Victim-1 received several phone calls on an almost daily basis demanding that Victim-1 make payments in order to receive the lottery winnings. Victim-1 believed that he was speaking with a variety of different people on these calls, including both women and men. These calls, in part, instructed Victim-1 to make transfers of money to certain identified individuals.

d.    Victim-1 also received letters from "IRS.com" regarding his purported lottery winnings. One letter stated that Victim-1 owed $45,090 and stated "Please note that it is the duty of the I.R.S. to collect taxes on behalf of the government, kindly make every effort to sort out this matter in the shortest possible time. Please be reminded that non-payment of taxes due it [sic] is a federal offence." Another letter stated that the "I.R.S. has . . . verified and has recorded the payment that to be made in excess of three million dollars [sic]" in lottery winnings.

e.    Victim-1 also received a letter purporting to be from the "Federal Bureau of Investigation." That letter stated that over the course of an investigation, a check payable to Victim-1 had been "confiscated from criminals who were on a rampage to scam many clients of" an international sweepstakes and lottery company. The letter stated that Victim-1 would be required to provide to the "Bureau . . . some information which we will readily take via telephone" in order to receive the funds due to Victim-1.

f.    As a result of these calls and letters, Victim-1 transferred over $400,000 to a variety of individuals through

3

various means, including through the use of reloadable, prepaid debit cards, at the direction of those who had telephoned and/or contacted Victim-1 regarding his purported lottery winnings.

### Victim-2

7.    I have spoken with an individual ("Victim-2"), and have reviewed documents provided by Victim-2.  From Victim-2, I have learned the following, among other things:

a.    Victim-2 resides in the Bronx, New York.

b.    In approximately 2009, Victim-2 received a telephone call from an individual who represented, in substance and in part, that Victim-2 had won $3.5 million from the "Global International Lottery and Sweepstakes" and had to pay taxes and other charges related to that sweepstakes before the winnings would be transmitted to Victim-2.

c.    Victim-2 subsequently received a number of phone calls and emails from various individuals purporting to be related to the "Global International Lottery and Sweepstakes," and requesting that Victim-2 make payments and send personally identifying information to specified individuals.

d.    As a result of the phone calls and emails Victim-2 received, Victim-2 sent over $100,000, mostly through Western Union and MoneyGram, to individuals, including "Dwayne Campbell."  Victim-2 stated that most of the wires were made to individuals located in Jamaica.  One of the individuals that Victim-2 was instructed to send money to was "Dwayne Campbell."

### Victim-3

8.    I have spoken with an individual ("Victim-3"), and have reviewed documents provided by Victim-3.  From Victim-3, I have learned the following, among other things:

a.    Victim-3 resides in Alabama.

b.    In approximately 2013, Victim-3 was contacted by telephone by "Mr. Johnson" from the "Internation Merchant Bank," who said that Victim-3 had won $450,000 in a lottery and needed to pay for a tax certificate in order to receive the winnings.

c.    Victim-3 was later contacted in connection with the purported lottery winnings by another individual, who said that "Dwayne Campbell" was an agent who would collect money from Victim-3 to pay for a tax certificate.

### Review of Records Relating to
### Money Transfers and Dwayne Campbell

9.     I have spoken with an employee of the Department of Homeland Security and I have learned, among other things, that on or about August 25, 2013, "Dwayne E. Campbell" entered the United States from Jamaica using a Jamaican passport.

10.     From my investigation, I have learned that NetSpend and GreenDot are vendors of reloadable, prepaid debit cards that work in the following manner.  Individuals can open accounts with NetSpend and GreenDot, which are associated with a debit card.  Individuals can then add funds to those accounts by purchasing a "NetSpend Reload Pack" or a "GreenDot Money Pak," for NetSpend and GreenDot respectively, in various money amounts.  These "Reload Packs" or "Money Paks" can be used to credit debit card accounts, either online or over the phone.

11.     From my review of records from NetSpend, I have learned, among other things, the following:

     a.     On or about May 12, 2009, a NetSpend account was opened online in the name of "Dwayne Campbell," using a Jamaican government identification number (the "Jamaican ID Number") and an address in Brooklyn, New York (the "Brooklyn Address").

     b.     Approximately $11,000 was credited onto the NetSpend account through Reload Packs that were purchased by Victim-1.

     c.     Withdrawals or charges were made using the debit card associated with the NetSpend account at the following locations and dates, among others: (i) on or about June 13, 2009 in Yonkers, New York, (ii) on or about July 29, 2009 in Manhattan, New York, (iii) from approximately August 2009 to January 2010, in Jamaica, and (iv) on or about July 11, 2010 in Manhattan, New York.

12.     From my review of records from GreenDot, I have learned, among other things, that approximately $29,000 in Money Paks were purchased by Victim-1.  Those Money Paks were then used to credit three debit cards in the name of "Dwayne Campbell."  For one of the three debit cards, the Jamaican ID Number was provided by the user in lieu of a social security number.

5

13.   From my review of records obtained from Western Union, I have learned, among other things, that:

a.   Between in or about March 2010 and November 2012, Victim-2 transferred approximately $1,755 from the Bronx, New York to "Dwayne Campbell" and "Dwayne Emmanuel Campbell" in Jamaica via Western Union wire transfers.  For several of these wire transfers, identification bearing the Jamaican ID Number was used by the recipient of the wire to verify his identity to Western Union.

b.   On or about April 3, 2013, Victim-3 transferred approximately $375 to "Dwayne Campbell" in Jamaica via Western Union.  For that wire transfer, identification bearing the Jamaican ID Number was used by the recipient of the wire to verify his identity to Western Union.

14.   From my review of records obtained from MoneyGram, I have learned, among other things, that between April 2, 2013 and May 3, 2013, Victim-3 and Victim-3's son transferred approximately $3,200 via MoneyGram to "Dwayne Campbell" in Jamaica.

### Campbell's Statements and Admissions

15.   I and another law enforcement agent have interviewed DWAYNE CAMPBELL, a/k/a "Dwayne Emmanuel Campbell," the defendant, at the Brooklyn Address.  After being advised of his Miranda rights, CAMPBELL related the following, among other things:

a.   CAMPBELL provided the Jamaican ID Number as the number associated with his Jamaican driver's license.

b.   CAMBPELL stated that he was in the United States from on or about April 2, 2009 to on or about August 6, 2009, and then again from on or about June 17, 2010 to on or about July 11, 2010.[1]  CAMPBELL stated he last entered the country on or about August 25, 2013.

---

[1] The periods of time during which CAMPBELL stated he was in the United States and Jamaica correspond to the dates during which the debit card associated with the NetSpend account was used in the United States and in Jamaica, as set forth in Paragraph 11(c) above.

c.      CAMPBELL claimed that in approximately 2009, he began collecting money from individuals located in the United States on behalf of CAMPBELL's acquaintances in Jamaica.

d.      CAMPBELL claimed that he learned in early 2013 that the money he was collecting was the proceeds of fraudulent lottery schemes, in which victims were told they had won a lottery and needed to make advance tax payments to receive their lottery winnings.

e.      In approximately February or March 2013, CAMPBELL received a list of names, addresses, and telephone numbers of individuals CAMPBELL understood were potential victims of fraudulent lottery schemes.  CAMPBELL called people on that list, claimed to be named "Dwight Johnson," and told them that they had won the lottery but had to pay him a delivery fee of $200 in order to collect their winnings.

f.      CAMPBELL claimed that he collected between $800 and $1,200 as a result of those telephone calls.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of DWAYNE CAMPBELL, a/k/a "Dwayne Emmanuel Campbell," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.


KRYSTOFOR PROEV
Special Agent
United States Department of Treasury
Inspector General for Tax
Administration

Sworn to before me this
13th day of February, 2014



_____
THE HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York